UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

# M07-1123

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

NIKOLAI DOZORTSEV,
      also known as "Nicky" and "Kolja,"
ARTHUR DOZORTSEV,
BORIS NAYFELD and
ROBERTO ALCAINO,

      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND
DESCRIBED AS 2805 OCEAN
PARKWAY, APARTMENT 10B,
BROOKLYN, NEW YORK.

- - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

THE PREMISES KNOWN AND
DESCRIBED AS 161 NEVADA
AVENUE, STATEN ISLAND,
NEW YORK.

- - - - - - - - - - - - - - - - - - - - - - - - - X

**FILED UNDER SEAL**

**AFFIDAVIT AND COMPLAINT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS**
(21 U.S.C. § 846, 18 U.S.C. 1956(h))

**AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT**

(T. 18, U.S.C., § 1956; T. 21, U.S.C.,
§§ 841, 843, 846, 952(a), 959 and
963)

**AFFIDAVIT IN SUPPORT
OF SEARCH WARRANT**

(T. 18, U.S.C., §§ 1956; T. 21 U.S.C.,
§§ 841, 843, 846, 952(a),
959(a) and 963)

EASTERN DISTRICT OF NEW YORK, SS:

      RYAN McHUGH, being duly sworn, deposes and says that he is a Special Agent of

the Drug Enforcement Administration, duly appointed according to law and acting as such:

      Upon information and belief, there is probable cause to believe that in or about and

between 1990 and October 12, 2007, both dates being approximate and inclusive, within the Eastern

District of New York and elsewhere, the defendants NIKOLAI DOZORTSEV, also known as "Nicky" and "Kolja," BORIS NAYFELD and ROBERTO ALCAINO, together with others, did knowingly and intentionally conspire to distribute and possess with intent to distribute a controlled substance, which offense involved: (a) five kilograms or more of a substance containing cocaine, a Schedule II controlled substance, (b) one kilogram or more of a substance containing heroin, a Schedule I controlled substance, and (c) a substance containing MDMA, a Schedule I controlled substance, all in violation of Title 21, United States Code, Section 841(a).

(Title 21, United States Code, Section 846; Title 18, United States Code, Sections 3551 et seq.)

Upon information and belief, there is probable cause to believe that in or about and between 1990 and October 12, 2007, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants NIKOLAI DOZORTSEV, also known as "Nicky" and "Kolja," BORIS NAYFELD and ARTHUR DOZORTSEV, together with others, did knowingly and intentionally conspire to conduct financial transactions in and affecting interstate and foreign commerce, to wit: the transportation, transmission and transfer of funds to and through companies and bank accounts, which in fact involved the proceeds of specified unlawful activity, to wit: narcotics trafficking, in violation of Title 21, United States Code, Section 846, as well as fraud and trafficking in illegal cigarettes, knowing that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, (a) with the intent to promote the carrying on of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i), and (b) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, the location, the source, the ownership and the control of

2

the proceeds of the specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

(Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

The source of your deponent's information and the grounds for his belief are as follows:[1]

## Qualifications and Sources of Information

1.     I have been a Special Agent with DEA for approximately two years. My training, education and experience includes debriefing numerous cooperating witnesses; monitoring wiretapped conversations of individuals involved in narcotics, money laundering and complex fraud; reviewing taped conversations and narcotics, money laundering and complex fraud records; conducting numerous searches of locations where narcotics, money laundering and complex fraud records, evidence and proceeds have been found; and conducting surveillance of individuals engaged in such offenses. Through this training and experience, I have become familiar with the manner in which narcotics trafficking, money laundering and complex fraud are committed, the method of payment and collection of payment in such schemes, and the efforts of persons involved in such activity to avoid detection by law enforcement.

2.     The facts set forth in this affidavit are based in part on information that I have learned from review of written documents prepared by, and conversations with, other law enforcement officers associated with the DEA, as well as other state and federal law enforcement agencies and law enforcement agencies from a number of countries in Europe, South America and

---

[1] Because the purpose of this affidavit is to set forth only those facts necessary to establish probable cause to search and arrest, I have not described all the relevant facts and circumstances of which I am aware.

Asia. All conversations with undercover agents and informants, as well as wiretap intercepts, are set forth in substance and in part only. Moreover, descriptions of wiretap intercepts are based on a review of line sheets, and where the conversations were conducted in foreign language, are based on preliminary, draft transcripts prepared by interpreters.

## FACTS

### Background on Ricardo Fanchini, the Fanchini Organization and the Defendants

3.      The DEA is conducting an ongoing investigation aimed at dismantling an international narcotics trafficking, cigarette trafficking, fraud and money laundering organization headed by Ricardo Fanchini, a high-ranking member of Russian Organized Crime. Since the early 1980's, Fanchini's organization has been responsible for distributing and transporting thousands of kilograms of heroin, cocaine and MDMA throughout Southeast Asia and Europe, which was ultimately imported into the United States. In addition, Fanchini's organization laundered the proceeds of their illegal narcotics trafficking and other criminal activities, such as fraud and cigarette smuggling, through various companies and bank accounts in the United States and Europe. Among the individuals identified as Fanchini's criminal associates are NIKOLAI DOZORTSEV, ARTHUR DOZORTSEV and BORIS NAYFELD.

4.      Fanchini is one of the highest-ranking members of Russian Organized Crime in Europe. Since the 1980's Fanchini and his organization have been responsible for smuggling and distributing thousands of kilograms of heroin, cocaine and MDMA throughout Europe and the United States, and laundering millions of dollars in narcotics proceeds. Previous investigations by the DEA and law enforcement authorities all over the world have succeeded in intercepting and seizing narcotics shipments and prosecuting members of the Fanchini Organization, however, in

virtually every case, Fanchini was able to escape prosecution and conviction by insulating himself with multiple layers of subordinates, coordinating his narcotics operations from foreign jurisdictions that he rotated on a regular basis, and hiding his involvement through the use of false names, fictitious entities and by concealing all of his businesses and assets under the names of his wives and ex-wives. In addition to a 2000 conviction for fraud in Belgium, Fanchini is also a fugitive from a 1987 arrest in New Jersey for burglary. Because of an active bench warrant from this matter, Fanchini has been unable to personally travel to the United States. In October 2007, Fanchini was arrested in Great Britain based on a narcotics trafficking indictment and arrest warrant issued in the Eastern District of New York. He is awaiting extradition.

5.      Beginning around 1990, Fanchini owned and operated an import/export company called M&S International, based in Antwerp, Belgium. A DEA investigation, which obtained evidence through the use of cooperating witnesses, multiple reliable sources of confidential information and surveillance (both physical and electronic), revealed that the company was being used to ship hundreds of kilograms of heroin from Southeast Asia (secreted inside electronic equipment such as television picture tubes) to warehouses in Poland and Belgium, where the drugs were stored until being smuggled into the Eastern District of New York through the use of human couriers and other methods. Belgian and German authorities also investigated M&S International, and determined that M&S International was being used to launder millions of dollars in narcotics proceeds. The Belgian and German investigations obtained evidence of drug trafficking that was consistent with the evidence obtained by the DEA.

6.      BORIS NAYFELD is a high-ranking member of Russian Organized Crime and a long-time associate of Fanchini. Previous investigations by the DEA have revealed that

NAYFELD has been involved in international narcotics trafficking for the Fanchini Organization since the early 1980's (resulting in a previous narcotics-related conviction) and continues to maintain close ties to other well-known convicted narcotics traffickers such as the defendant ROBERTO ALCAINO and others. NAYFELD was a principal manager of M&S International, Fanchini's front company that was used to smuggle thousands of kilograms of Southeast Asian heroin throughout Europe and into the United States. NAYFELD was arrested by the DEA and on August 10, 1994, NAYFELD pled guilty to racketeering charges in the U.S. District Court, Southern District of New York, for his role in using M&S International as a "front" company for the Fanchini Organization to ship over hundreds of kilograms of heroin into New York. In connection's with NAYFELD's arrest in that case, he made extensive statements to DEA agents confirming that the Fanchini Organization used M&S International to traffic in large quantities of Southeast Asian heroin, which was smuggled into Europe and the United States.

7.     Beginning in the early 1990's, Fanchini assumed ownership over another front company called Kremlyovskaya Group ("Kremly Vodka"), a liquor distribution company based in Antwerp, Belgium. Parallel investigations by the DEA and Belgian law enforcement showed that the defendants BORIS NAYFELD, NIKOLAI DOZORTSEV, ARTHUR DOZORTSEV were involved in the management and operation of Kremly Vodka. At the time, NAYFELD made numerous statements to a reliable confidential source of information, whose information has proven reliable in the past and been corroborated by independent evidence, confirming that he was closely involved in using Kremly Vodka as a front for the Fanchini Organization's narcotics trafficking and money laundering activities (in the same manner as M&S International).

6

8.      The Belgian investigation into Kremly Vodka resulted in Fanchini's arrest in 1997. The Belgian investigation focused on a number of suspicious multi-million dollar transactions that Fanchini orchestrated through Kremly Vodka, that were in fact the proceeds of the Fanchini Organization's illegal activities. Fanchini pled guilty and was convicted of the lesser offense of embezzlement and fraud instead of more serious narcotics trafficking and money laundering charges. In 2000, Fanchini was sentenced to a four-year term of imprisonment and fined $5.5 million.

9.      After Fanchini discovered that Belgian authorities were investigating him for his ownership and operation of Kremly Vodka, Fanchini purported to transfer ownership of the company to both of the DOZORTSEVs for $20 million.[2] In statements NAYFELD made to DEA agents in connection with his arrest in the Southern District of New York racketeering case in or about 1994, NAYFELD himself admitted that this was a sham sale done for the purpose of Fanchini avoiding having to forfeit the profits to the Belgian government. NAYFELD further confirmed to DEA agents that a percentage of the profits from Kremly Vodka continued to be kicked back to Fanchini. Moreover, judicially-authorized wire intercepts conducted by the Belgian government during the investigation into Kremly Vodka revealed that in or about 1997, Fanchini wanted to get his name out of the company because the criminal investigation, and news articles about the investigation, were spoiling the "business." Fanchini also was intercepted discussing selling the rights to Kremly Vodka to "Kolja" [NIKOLAI DOZORTSEV], who would continue his "business" in the United States. In another intercepted call, Fanchini discussed flying to Switzerland with an

----

[2]      An examination of business records confirms the purported sale and transfer of the company to the DOZORTSEVs. Further analysis confirmed, however, that no money actually changed hands. After this sham "sale," official business records from Kremly Vodka began to list the DOZORTSEVs as the owners of Kremly Vodka, along with other long-time associates of Fanchini.

associate in order to find a bank where Fanchini could open a new, hidden, account and deposit $7 million. Fanchini explained that he could not do this with his own account because law enforcement would immediately suspect money laundering.

10.     NIKOLAI DOZORTSEV is a high-ranking member of Russian Organized Crime and a long-standing associate of Fanchini.  Based on evidence uncovered during this investigation, including: intercepted telephone conversations between NIKOLAI DOZORTSEV and Fanchini; information provided by reliable confidential sources; evidence obtained in previous investigations by the DEA and law enforcement from various European countries; surveillance conducted by agents from the DEA; and analysis of business and bank account records, investigating agents believe that NIKOLAI DOZORTSEV currently acts as Fanchini's right-hand lieutenant in coordinating the narcotics trafficking and money laundering activities of the Fanchini Organization. NIKOLAI DOZORTSEV has been involved in laundering drug proceeds, and the proceeds of additional crimes such as illegal cigarette trafficking and fraud, for Fanchini through Kremly Vodka, and is continuing to launder money for Fanchini through shell corporations, off-shore real estate investments, structuring financial transactions and funneling millions of dollars through bank accounts under his control to other criminal members of the Fanchini Organization (including Fanchini himself).

11.     The defendant ARTHUR DOZORTSEV is the brother of NIKOLAI DOZORTSEV, and conducts money laundering activities for the Fanchini Organization at his brother's direction.  ARTHUR DOZORTSEV also has a 1995 felony narcotics  conviction from Miami, Florida for criminal possession of a dangerous drug in the 3rd degree (Rohypnol).  Both DOZORTSEVs were involved in laundering drug proceeds for Fanchini through Kremly Vodka, and

8

are continuing to launder money for Fanchini through shell corporations, off-shore real estate investments, structuring financial transactions and funneling millions of dollars through bank accounts under their control to other criminal members of the Fanchini Organization (including Fanchini himself, through his current wife).

12.    After NAYFELD completed his sentence in or about May 1998, a DEA investigation revealed that NAYFELD was attempting to form a narcotics distribution and money laundering partnership between the Fanchini Organization and the defendant ALCAINO, a convicted narcotics trafficker whom NAYFELD met while serving his sentence.

### The EDNY Wiretap Investigation

13.    On June 15, 2007, the Honorable Edward R. Korman authorized the interception of wire communications over telephone number (917) 443-3736, IMSI #310260591247687, a T-Mobile USA cellular telephone listed to NICKY DOZORTSEV, 2805 Ocean Parkway, Apt. 10B, Brooklyn, NY 11235 (the "DOZORTSEV 3736 TELEPHONE"). On July 13, 2007, and August 10, 2007, the Honorable Brian M. Cogan, Eastern District of New York authorized renewed interception on the DOZORTSEV 3736 TELEPHONE. On September 7, 2007, the Honorable Edward R. Korman authorized renewed interception on the DOZORTSEV 3736 TELEPHONE. On October 5, 2007 the Honorable Brian M. Cogan, Eastern District of New York authorized renewed interception on the DOZORTSEV 3736 TELEPHONE. DEA agents began intercepting calls over this telephone commencing June 16, 2007 and were renewed thereafter.

14.    On July 9, 2007, the Honorable Edward R. Korman authorized the interception of wire communications over TELEPHONE NUMBER (917) 969-4550, AN AT&T WIRELESS TELEPHONE WITH IMEI/ESN NO: 353399004671441, SUBSCRIBED TO BY

ARTHUR DOZORTSEV, 10 21ST STREET, #2, BROOKLYN, NEW YORK 11232 (the "DOZORTSEV 4550 TELEPHONE"). On August 7, 2007, the Honorable Edward R. Korman authorized renewed interception over the DOZORTSEV 4550 TELEPHONE. DEA Agents began intercepting calls over the DOZORTSEV 4550 TELEPHONE on July 9, 2007. Interception was terminated on September 6, 2007.

      15.    On July 27, 2007, the Honorable Christina A. Snyder , U.S. District Court Judge for the Central District of California, authorized the interception of wire communications over telephone number (626) 523-9129, a wireless telephone subscribed to Absolut Investments Inc., 351 E. Foothill Blvd., Suite 200, Arcadia, CA. and used by SUBJECT ROBERTO ALCAINO (the "ALCAINO WIRELESS TELEPHONE"). Interceptions were terminated on August 26, 2007. Judge Snyder issued a renewal order on September 4, 2007. DEA agents intercepted calls over the ALCAINO WIRELESS TELEPHONE between July 27, 2007 and August 26, 2007. They began intercepting calls again on September 4, 2007.

      16.    On September 4, 2007, the Honorable Brian M. Cogan, United States District Court Judge for the Eastern District of New York, authorized the interception of wire communications over telephone number (718) 668-0010, a Verizon New York landline, subscribed to Angela Kiperman, 161 Nevada Avenue, Staten Island, New York, and used by SUBJECT BORIS NAYFELD (the "NAYFELD 0010 TELEPHONE"). DEA agents began intercepting calls over the NAYFELD 0010 TELEPHONE on September 6, 2007. Interception terminated on September 17, 2007 after NAYFELD left the United States to travel back to Russia, and resumed on October 2, 2007 upon his return to the United States. On October 5, 2007, the Honorable Brian M. Cogan issued a renewal order for the NAYFELD 0010 TELEPHONE and the interception is ongoing.

17.    On June 5, 2007, the Honorable Edward R. Korman authorized the interception of wire communications over telephone number (718) 938-2000, a Verizon Wireless cellular telephone with ESN/MEID No. 036-15860812, subscribed to in the name of Global Spirits Marketing, Nikolai Dozortsev, President, and listed to 2805 Ocean Parkway, Apt. 10B, Brooklyn, N.Y. (the "DOZORTSEV 2000 TELEPHONE").  On July 9, 2007, the Honorable Edward R. Korman authorized renewed interception on the DOZORTSEV 2000 TELEPHONE.  DEA agents began intercepting calls over the DOZORTSEV 2000 TELEPHONE commencing June 6, 2007. Interception over the DOZORTSEV 2000 TELEPHONE was terminated on August 7, 2007 because NIKOLAI DOZORTSEV, the user of the DOZORTSEV 2000 TELEPHONE, traveled to the Ukraine and the DOZORTSEV 2000 TELEPHONE does not have the capability of being used outside the United States.  Based on travel records and intercepted calls, investigating agents confirmed that DOZORTSEV returned to the United States on or about  August 17, 2007.  On August 24, 2007, the Honorable Brian M. Cogan, Eastern District of New York, issued an order authorizing renewed interception on the DOZORTSEV 2000 TELEPHONE, and DEA agents began intercepting this phone again on August 24, 2007.  On September 24, 2007,  the Honorable Brian M. Cogan, Eastern District of New York, issued an order authorizing the continue interception of the DOZORTSEV 2000 TELEPHONE.

## THE FANCHINI ORGANIZATION'S RECENT DRUG TRAFFICKING AND MONEY LAUNDERING ACTIVITIES

### The January 2004 Seizure of 300 Kilograms of Fanchini's Cocaine

18.     Beginning in January 2004, the DEA received information from a reliable confidential source that Fanchini, who was in the U.K. at the time, was financing multi-kilogram cocaine smuggling ventures by a cocaine trafficker.  The investigation revealed that the cocaine trafficker was smuggling hundreds of kilograms of cocaine from South America to the United States and the United Kingdom.

19.     On or about February 6, 2004, the DEA Buenos Aires Country Office, along with the Uruguay Prefectura Nacional Naval, the Uruguay Federal Police and British Customs, initiated an investigation into the cocaine trafficking activities of the head of a drug trafficking organization which smuggled cocaine from Uruguay to Europe (the "drug trafficker").  During this investigation, Fanchini was identified as an associate of the drug trafficker.  Court-authorized interceptions over the telephone identified as being used by drug trafficker, which interceptions took place in Uruguay in or about December 2004, demonstrated that Fanchini was financing the narcotics trafficking activities of the drug trafficker and arranging for the transportation of hundreds of kilograms of cocaine.  In particular, Fanchini and the drug trafficker were intercepted on judicially-authorized wiretaps discussing plans to ship loads of "wood," which in my opinion, based on my training, experience and knowledge of the investigation to date, was a coded reference to cocaine.  During these calls, the drug trafficker asked Fanchini to provide transportation for the "wood," in addition to financing the operation, because the "wood" was ultimately going to the United

12

Kingdom, where Fanchini resided at the time. Fanchini agreed to arrange for transportation of the "wood" shipments.

20. Based on information provided by the wiretaps, the DEA, in conjunction with law enforcement agents from several European and South American countries, seized over 200 kilograms of cocaine in Charleston, South Carolina and over 100 kilograms of cocaine in Europe. In each case, the cocaine was transported by sea vessels (the same method that the Fanchini Organization used in the Dutch MDMA venture) and concealed within shipments of timber (the "wood" referred to by Fanchini and the drug trafficker). A criminal associate in Vienna, who was arranging for receipt of the cocaine shipments that were seized, is currently being prosecuted in Austria for his role in the narcotics trafficking conspiracy.

## The DOZORTSEVs' Role in the Fanchini Organization

21. The current investigation has revealed, through the development of confidential sources of information, the interception of wire communications, review of bank records and business documents and other leads, that the DOZORTSEVs are continuing to launder millions of dollars in drug and other illegal proceeds, such as illegal cigarette trafficking and fraud, for the Fanchini Organization through numerous offshore investments by, among other things, creating "shell" companies to hide the nature and ownership of assets, and purchasing high-value luxury items such as African diamonds or gold as a means of converting drug proceeds to an easily transportable form of currency as well as a much more difficult commodity to trace.

22. Through the analysis of over 15 bank accounts controlled by the DOZORTSEVs or other members of the Fanchini organization, fellow agents and I have identified active accounts, business and personal, that demonstrate DOZORTSEVs' use of "shell companies"

to send and receive wire transfers. The majority of the identified "shell" companies are incorporated in the British Virgin Islands, Russia or Cyprus which are countries considered high risk for money laundering. Agents discovered that when wire transfers involving the aforementioned shell companies take place the wire is generally ordered from Germany or Russia and the banks involved are located in Latvia or other Baltic countries. Recipients of the funds were often located elsewhere and did not appear to have a normal or legitimate business relationship with the originator.

23.     More specifically, at least seven shell companies have been identified as conducting wire transfers with the personal bank account of NIKOLAI DOZORTSEV totaling in the hundreds of thousands of dollars. Analysis of all the accounts that have been identified, to date, as being controlled by the DOZORTSEVs, and their purported businesses, have noted many more suspected "shell" companies conducting transactions that also amount to hundreds of thousands of dollars. Specifically, hundreds of thousands of dollars have been wired into and out of accounts controlled by the DOZORTSEVs, from and to accounts held in the name of "front" companies that have no active and/or legitimate business operations. The sources of these funds appear suspicious and do not have any legitimate business purpose that could be ascertained. Based on my training and experience, I know that drug trafficking and money laundering organizations rely on shell companies to ship drugs and launder money. In particular, the Fanchini Organization has a history of using such companies (including M&S International and Kremly Vodka) to conduct its illegal activities. I also know that this is a common technique for Russian Organized Crime members.

24.     A review of bank records for NIKOLAI DOZORTSEV and ARTHUR DOZORTSEV also reveals that they are funneling money to Fanchini and using businesses in the United States to launder drug proceeds from Fanchini by wiring money to offshore bank accounts

14

held in the name of Fanchini's wife ("Fanchini's Wife") and ex-wives ("Fanchini's Ex Wife 1" and "Fanchini's Ex Wife 2"). For example, on April 18, 2007, ARTHUR DOZORTSEV received a wire transfer of approximately $600,000 from a United Kingdom bank account held in the name of Fanchini's Ex Wife 1; within a week, ARTHUR DOZORTSEV wired the $600,000 to a bank account held in the name of DOZORTSEV REALTY LLC, a corporate shell owned by ARTHUR DOZORTSEV and another individual. On May 7, 2007, ARTHUR DOZORTSEV received a wire transfer of approximately $600,000 from DOZORTSEV REALTY LLC, which was then wired the next day to a bank account held in the name of Fanchini's Ex Wife 1 in Malaga, Spain. Wiretap intercepts also revealed a $400,000 wire transfer from Fanchini's Ex Wife 1 to ARTHUR DOZORTSEV in June 2007, and a $1.25 million wire transfer from Fanchini to an attorney escrow account for NIKOLAI DOZORTSEV. Intercepted calls between the DOZORTSEVs, Fanchini and Fanchini's Ex Wife 1 made clear that Fanchini was the ultimate source of these funds, and that Fanchini was hiding the source of the funds by putting all of his assets and investments in the name of his wife.

25.     In addition, analysis of NIKOLAI DOZORTSEV's bank accounts reveals his connection to overseas real estate investments connected to Fanchini and identified as being used to launder illegal proceeds. In 2006, Belgium officials conducted an investigation into the criminal activity, including money laundering, of David Bendavid. Bendavid is a criminal associate of the Fanchini Organization who was convicted in Antwerp, Belgium on May 21, 2003 for illegal cigarette smuggling and bribery. As a result of the evidence obtained, a search warrant was executed at the residence of Bendavid. Documents seized from Bendavid's residence provided evidence that Bendavid was involved in cigarette smuggling, fraud and laundering the money from his criminal

15

activities. Documents seized from Bendavid's apartment depicted the transfer of funds through bank accounts and the purchase of real estate in the country of Ukraine. Belgian government officials determined that the real estate transactions were part of a money laundering scheme and continued to investigate.[3] Documents seized by investigators identified Bendavid's partners in the Ukranian real estate investments to be Fanchini's Ex Wife 1 and NIKOLAI DOZORTSEV.

26. Based on the documents seized from Bendavid, investigators reviewed documents in the Ukraine. As a result, it was determined that at least twenty-four companies were set up in the Ukraine. These companies were under a holding company named Bereg Group. Of the twenty-four companies under Bereg Group, NIKOLAI DOZORTSEV, Fanchini's Ex Wife 1 and Bendavid were listed as the owners, managing directors and controlling shareholders of at least three companies: Admiral Stroyinvest, Bereg Stroygrup, and Marin Invest. A review of partial bank records from these companies revealed that millions of dollars was wired into these shell corporations by criminal associates of the Fanchini Organization, including NIKOLAI DOZORTSEV, Fanchini's Ex Wife 1, and Bendavid. In virtually every case, the wire transfers were made through the accounts of shell companies formed in the British Virgin Islands, Cyprus and other foreign locations with lax corporate and banking regulations. None of these companies have any ascertainable business operations. In particular, many of the money transfers were made from Baltic banks into accounts that were owned by Radonia Ltd in Cyprus. From Radonia, the money went to Bereg and then into the real estate development companies in the Ukraine. From a review of bank

---

[3] Bendavid fled from Belgium to Israel while the investigation was being conducted. Pursuant to their criminal money laundering investigation, Belgian law enforcement seized property Bendavid owned in Antwerp worth approximately $700,000. Bendavid never contested the forfeiture of this property.

records, agents have identified numerous wire transfers (for hundreds of thousands of dollars) from the DOZORTSEVs, Fanchini's Ex Wife 1 and another Fanchini associate to accounts owned by Radonia.

27.     Based on their training and experience, and all of the evidence that has been obtained thus far from the current investigation and a parallel investigation conducted by Belgian law enforcement, investigating DEA agents believe that the Fanchini Organization is laundering the profits from its narcotics trafficking activities through these shell companies and real estate investments in the Ukraine. In support of that belief, DEA agents and law enforcement officials throughout Europe conducted an investigation into the businesses purportedly owned or controlled by the DOZORTSEVs, Fanchini's Ex Wife 1 and Bendavid. This investigation revealed that the DOZORTSEVs do not own, manage or control any companies with legitimate, tangible business operations except for a small company based in New York called "Dozortsev & Sons." Dozortsev & Sons' only legitimate business operations involve the importation and distribution of a limited selection of wines produced in the country of Georgia. Similarly, Fanchini's Ex Wife 1 and Bendavid have no ownership interest, operational authority or any other involvement in any businesses with legitimate, tangible operations. Accordingly, there is no ascertainable business purpose or legitimate business source for the millions of dollars in funds that have been transferred to and from shell companies purportedly owned and controlled by the DOZORTSEVs, Fanchini's Ex Wife 1 and Bendavid.

28.     In the course of their money laundering investigation, Belgian authorities determined that a Fanchini associate ("Fanchini Associate #1") was the managing director of Bereg Group. A review of intercepted telephone calls and bank account records revealed that Fanchini,

Fanchini's Ex Wife 1 and NIKOLAI DOZORTSEV are continuing to wire large amounts of money to Fanchini Associate #1, who invests the proceeds in Ukranian land deals. Based on their training and experience and the investigation that has been conducted thus far, including multiple intercepted calls in which NIKOLAI DOZORTSEV, NAYFELD and Fanchini discuss sending money to Fanchini Associate #1 in the Ukraine, multiple intercepted calls during which NIKOLAI DOZORTSEV, NAYFELD and Fanchini's Ex Wife 1 discuss picking up proceeds from narcotics trafficking activities and delivering that drug money to the Ukraine, bank account records showing a continuous pattern of money transfers into Fanchini Associate #1's Bereg Group companies through shell corporations controlled by the DOZORTSEVs and/or Fanchini's Ex Wife 1, and multiple intercepted calls during which NIKOLAI DOZORTSEV and other Fanchini associates ask for proceeds to be wired to them from Fanchini Associate #1's Bereg Group holdings, investigating agents believe that Fanchini Associate #1 and Bereg Group are one of the main sources through which Fanchini and the Fanchini Organization launders the proceeds from its narcotics trafficking activities.

### NAYFELD Forms A Criminal Partnership With ALCAINO

29.     After NAYFELD completed his sentence in or about May 1998, a DEA investigation revealed that NAYFELD was attempting to form a narcotics distribution and money laundering partnership with the defendant ALCAINO and Marcos Cojab,[4] convicted narcotics traffickers who NAYFELD met while serving his sentence.

---

[4]Marcos Cojab is the head of a violent cocaine trafficking organization and is currently serving a federal term of imprisonment for narcotics trafficking, racketeering and murder.

30.    In or about and between April 2003 and May 2004, a DEA confidential source of proven reliability ("CS1") had several face-to-face meetings and telephone conversations with NAYFELD to discuss his planned narcotics and money laundering activities.  The information provided by CS1 was corroborated by other investigative methods including surveillance conducted by agents.

31.    During their numerous meetings and telephone conversations, NAYFELD told CS1 that he (NAYFELD) knew nothing about legitimate business.  NAYFELD admitted that he had a criminal mind and that crime was his forte.  In particular, NAYFELD stated that he had access to unlimited amounts of heroin, cocaine and marijuana.  NAYFELD stated that he had vast criminal and political contacts throughout the world but that he most often meets with other criminal contacts in Moscow, Russia.

32.    In June 2003, CS1 and NAYFELD traveled to Los Angeles, California to meet with ROBERTO ALCAINO.  The purpose of the meeting was to convince ALCAINO to provide NAYFELD with drug proceeds to launder.  NAYFELD stated that he needed CS1 to meet and understand NAYFELD's Russian contacts so that CS1 could persuade ALCAINO that NAYFELD's proposed narcotics partnership would be a worthy venture.  Through NAYFELD, CS1 understood that ALCAINO's money was from the sale of drugs.  NAYFELD also told CS1 about his attempt to create a seemingly legitimate financial framework in Russia to launder drug proceeds.  NAYFELD informed CS1 that his previous money laundering fronts, Kremly Vodka and M&S International, were the inspiration for the current endeavor.  Specifically, NAYFELD stated that he was a principal manager in the use of M&S International and Kremly Vodka (both owned by Fanchini) as "front"

companies through which his criminal contacts (the Fanchini Organization) could traffic in narcotics and launder narcotics proceeds under the auspice of legitimate international businesses.

33.     NAYFELD also stated to CS1 that this criminal venture was going to involve a partnership with ROBERTO ALCAINO and Marcos Cojab. NAYFELD described Cojab as still being in jail (confirmed by prison records) and having control over $50 million. According to CS1, NAYFELD was desperate to use this money to fund his new venture. As discussed in more detail below, although Cojab is still incarcerated, agents believe he is continuing to direct narcotics trafficking and money laundering activities of associates.

34.     In July 2003, CS1 and NAYFELD met with ALCAINO and an associate of Cojab. During this meeting, ALCAINO stated that he would like to launder $7 million to $8 million per week through NAYFELD and CS1. Based on the conversation, CS1 understood that the money was drug proceeds.

35.     During subsequent meetings with CS1 to discuss their drug trafficking and money laundering partnership, ALCAINO stated that he could provide up to one ton of cocaine for delivery into the United States or Europe. NAYFELD stated that he had two separate sources of supply for cocaine and could provide up to 400 kilograms of cocaine at a time.

36.     Based on intercepted telephone conversations, toll records, travel records and information provided by reliable confidential sources of information, some of which is described below, the current DEA investigation has revealed that NAYFELD and ALCAINO are continuing to traffic narcotics together for the Fanchini Organization, along with other Fanchini associates including NIKOLAI DOZORTSEV.

**NIKOLAI DOZORTSEV, ROBERTO ALCAINO and BORIS NAYFELD's Participation in Two Pending Deals for 400 Kilograms of Cocaine**

37.    In 2007, ROBERTO ALCAINO engaged in recorded meetings and telephone conversations with two confidential informants (CI1 and CI2) in an effort to secure a new source of supply of Colombian cocaine for the Fanchini Organization. Specifically, ALCAINO entered into negotiations with CI2 to procure a shipment of 50 kilograms of cocaine, with even larger shipments to occur on a regular basis in the future (based on the success of the initial shipment). After the initial meeting, ALCAINO continued to have recorded discussions with CI2 regarding the 50 kilogram deal. During the course of subsequent discussions, ALCAINO specifically stated that BORIS NAYFELD would be coordinating the cocaine shipment for the "Russians." ALCAINO stated to one of the informants that he had "business" with the "Russians" (including NAYFELD), and would arrange for the $200,000 to finance the deal to be sent through NAYFELD and NAYFELD's "Russian" associates.

38.    On or about September 19, 2007, agents intercepted a call pursuant to a court-authorized Title III wiretap over the telephone of NIKOLAI DOZORTSEV, during which ALCAINO left a message for NIKOLAI DOZORTSEV instructing him to call him (ALCAINO) because they had something very important to discuss and that "everything is on track." NAYFELD also made several calls to NIKOLAI DOZORTSEV during which he repeatedly asked NIKOLAI DOZORTSEV to call ALCAINO. In a follow-up conversation intercepted on September 30, 2007 over NIKOLAI DOZORTSEV's telephone, NAYFELD explained that ALCAINO had met with the Narco-Trafficker and that it was "very important" for NIKOLAI DOZORTSEV to call ALCAINO

and listen to what he had to say. NIKOLAI DOZORTSEV replied that he could not call him from his own phone because ALCAINO asked him not to use that phone.

39.     On October 1, 2007, agents intercepted a call over ALCAINO's cellphone, during which ALCAINO spoke to NAYFELD about the deal involving the Narco-Trafficker. During the call, NAYFELD told ALCAINO that "Nick" [NIKOLAI DOZORTSEV] was in New York and had another telephone. NAYFELD also stated that he had asked NIKOLAI DOZORTSEV to call ALCAINO. NAYFELD stated that if NIKOLAI DOZORTSEV and ALCAINO were both going to be in New York on the 12th for the party, the three men should talk personally.[5] ALCAINO agreed that it was better to talk in person than over the phone. ALCAINO stated that they [ALCAINO, NIKOLAI DOZORTSEV and NAYFELD] could talk in person on the 12th - this way, the three of them could find a solution, as they were ready to do business now. NAYFELD stated that NIKOLAI DOZORTSEV would call ALCAINO in twenty minutes.

40.     Less than an hour later, agents intercepted a call from NIKOLAI DOZORTSEV, using an unidentified number that was not captured, to ALCAINO over ALCAINO's cellphone.   During this call, NIKOLAI DOZORTSEV and ALCAINO discussed the pending cocaine transaction. ALCAINO explained that they would have to put a couple of dollars up [front $200,0000 for the cocaine], but they would be able to do the "business" now [could start the cocaine shipments now]. NIKOLAI DOZORTSEV and ALCAINO agreed to meet in New York to discuss the matter because it was not safe to talk over the phone. ALCAINO and NIKOLAI DOZORTSEV agreed they would meet in person to discuss the cocaine deal either the evening of October 11, or

---

[5] Previous intercepts disclosed that ALCAINO and NIKOLAI DOZORTSEV planned to attend NAYFELD's birthday party in Staten Island on October 12, 2007.

the morning of October 12 before the party. Intercepted calls between ALCAINO and NAYFELD revealed that NAYFELD would be picking ALCAINO up from Newark Airport on October 11, 2007.

41.     During calls with CI2, ALCAINO stated that the "Russians" were ready and asked for bank account information regarding where to send the $200,000. CI2 at first proposed a U.S. bank account, but ALCAINO responded that he did not want to use a U.S. bank for the transaction. CI2 subsequently provided ALCAINO with a European bank account that could be used.

42.     On October 10, 2007, CI2 spoke again to ALCAINO and asked for a face-to-face meeting in New York regarding the cocaine shipment. ALCAINO explained that he was arriving at Newark airport at 11:00 p.m. on October 11, 2007. ALCAINO stated that he would meet with CI2 on Friday morning (October 12). ALCAINO further stated that he was meeting with the "Russians" [NIKOLAI DOZORTSEV and NAYFELD] on Friday as well. Finally, ALCAINO stated that he wanted to travel with CI2 to Colombia to meet the source of supply prior to the cocaine being shipped.

## Intercepted Telephone Conversations

43.     As noted above, the investigation included multiple court-authorized wiretaps on telephones used by certain of the defendants. The following is just a sampling of incriminating recordings concerning the defendant's narcotics trafficking and money laundering activities on behalf of the Fanchini Organization.

## NIKOLAI DOZORTSEV Coordinates the Pickup
## of Narcotics Proceeds with BORIS NAYFELD

44.     Corroborating agents' belief that NIKOLAI DOZORTSEV acts as a "point
of contact" in directing and monitoring the narcotics operations of the Fanchini organization,
investigating agents intercepted several calls, pursuant to Court authorized wiretaps over two cellular
telephones used by NIKOLAI DOZORTSEV, 718-938-2000 and 917-443-3736, in which NIKOLAI
DOZORTSEV appeared to be speaking with Fanchini associates BORIS NAYFELD and Fanchini's
Ex Wife 1 regarding the transportation and disposition of proceeds from large-scale international
narcotics shipments.

45.     For example, on June 15, 2007, agents intercepted a call that NIKOLAI
DOZORTSEV received a Russian telephone number, during which the male caller identified himself
as "Gena from Moscow." During the call, NIKOLAI DOZORTSEV and "Gena" discussed hotels
in Odessa, Ukraine, and NIKOLAI DOZORTSEV  offers "Gena" the use of his (NIKOLAI
DOZORTSEV 's) driver while "Gena" is in the Ukraine. Partway through the call, "Gena" informed
NIKOLAI DOZORTSEV that "Boris wants to talk to you. I will put him on the phone." BORIS
NAYFELD then got on the phone and NIKOLAI DOZORTSEV told NAYFELD that he (NIKOLAI
DOZORTSEV ) had a conversation with the "girl" [Fanchini's Ex Wife 1] who "is organizing it
[drug shipment] for me." NIKOLAI DOZORTSEV asked NAYFELD when NAYFELD could go
pick up the "air" [money]. NAYFELD replied "any time; you name it." NIKOLAI DOZORTSEV
then asked NAYFELD if he (NAYFELD) could "come to the country we used to live in a while
ago?" NAYFELD stated that "to that country I'm afraid to travel." NIKOLAI DOZORTSEV then
told NAYFELD "so then don't go there. Give me a couple of hours. I'll try to arrange something

24

else." Based on their training and experience and the investigation that has been conducted thus far,

investigating agents believe that NIKOLAI DOZORTSEV and NAYFELD were discussing a prior

narcotics shipment NIKOLAI DOZORTSEV and NAYFELD organized, and that NIKOLAI

DOZORTSEV was having NAYFELD pick up the money ("air") that were the proceeds from the

drug sale. Agents further believe that NIKOLAI DOZORTSEV and NAYFELD were attempting

to hide the location of the drug transaction and money pickup by speaking in coded terms about the

country ("the country we used to live in a while ago") and that NAYFELD feared to travel to that

country because of his criminal history and the possibility of law enforcement detection.

46.     On June 16, 2007, NIKOLAI DOZORTSEV received a call from Fanchini's

Ex Wife 1 calling from a Belgian telephone. During the call, Fanchini's Ex Wife 1 informed

NIKOLAI DOZORTSEV that she was waiting for an unidentified male to arrive by plane and that

he should arrive by 3:15. NIKOLAI DOZORTSEV stated to Fanchini's Ex Wife 1 that he was

"waiting for the information from you." Based on their training and experience and the investigation

that has been conducted thus far, agents believe that Fanchini's Ex Wife 1 was awaiting the arrival

of a drug associate who will let Fanchini's Ex Wife 1 know about the test results of a sample of

drugs. Agents further believe that NIKOLAI DOZORTSEV was waiting for the drug associate's

opinion on the quality of the drugs. Corroborating that belief, NIKOLAI DOZORTSEV received

another call from Fanchini's Ex Wife 1. During this call, Fanchini's Ex Wife 1 told NIKOLAI

DOZORTSEV that "everything is ready in the B. You can take it." Based on their training and

experience and the investigation that has been conducted thus far, monitoring agents believe that

Fanchini's Ex Wife 1 was telling NIKOLAI DOZORTSEV that the proceeds from their last

narcotics venture were ready to be picked up in the "B." Based on subsequent intercepted calls and

other information obtained during this investigation, investigating agents believe the "B" refers to Brussels, Belgium. In addition, during the outset of the conversation NIKOLAI DOZORTSEV told Fanchini's Ex Wife 1 "wait a second, cops are walking by, wait a second" which indicates that NIKOLAI DOZORTSEV was engaged in a conversation that he believed should not be overheard by police officers. NIKOLAI DOZORTSEV and Fanchini's Ex Wife 1 then went on to speak about who would pick up the drug proceeds and then Fanchini's Ex Wife 1 stated "I need you to give it to me, I need to know how many and how much." Investigating agents believe that Fanchini's Ex Wife 1 was telling NIKOLAI DOZORTSEV that she needed him (NIKOLAI DOZORTSEV ) to get her the drug money (so she could launder it) and wanted to know how much money was to be picked up. NIKOLAI DOZORTSEV then states "Look, last time Victor took it from where it is now and did delivery to . . . where I am saying to you now. Let him do it again the same way." Investigating agents believe that NIKOLAI DOZORTSEV was directing Fanchini's Ex Wife 1 to have a previous drug associate, Victor, handle the money pickup and delivery in the same manner that drug proceeds were transported in the prior transaction.

47.    On June 16, 2007 NIKOLAI DOZORTSEV received a call from NAYFELD at a Moscow phone number. During this call, NIKOLAI DOZORTSEV told NAYFELD "I spoke with one girlfriend ( Fanchini's Ex Wife 1), today a partner [a drug associate] is arrived . . . .he (the drug associate) has all air [cash] . . . and need only to figure out where and how need to go pick air [cash] up . . . we are ready, ready." NAYFELD responded "I want to pick it up as soon as...sooner... give to [Fanchini Associate #1] and come back here." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that NIKOLAI DOZORTSEV was telling NAYFELD that Fanchini's Ex Wife 1 has the drug proceeds

from the previous transaction in hand and ready to be picked up. Agents further believe that NAYFELD was expressing his willingness to pick up the drug proceeds and deliver them to Fanchini Associate #1 in the Ukraine, one of the Fanchini Organization's primary money launderers. NIKOLAI DOZORTSEV informed NAYFELD that he planned to do the pickup "in the same place, where we lived, you and me live together," but NAYFELD responded that "you understand, I am not going over there." NIKOLAI DOZORTSEV stated "No, no, not necessary. I will tell him, he will delivery, where last time you met." NAYFELD responded "yes, yes, let me know, if I will . . . I will take a ticket and fly away." Investigating agents further believe that NAYFELD agreed to travel to pick up the drug proceeds from the prior narcotics sale, but was afraid to travel to the country where NIKOLAI DOZORTSEV was arranging for the transaction. I further believe that NIKOLAI DOZORTSEV agreed to arrange for the narcotics purchaser to deliver the money to NAYFELD in a different country, at a place where NAYFELD had previously met with the purchaser on another drug deal ("he will delivery, where last time you met").

48.    At approximately 12:09 p.m. on the same day, NIKOLAI DOZORTSEV received another call from Fanchini's Ex Wife 1. During this call, Fanchini's Ex Wife 1 told NIKOLAI DOZORTSEV that "he has broken car . . he does not have anything in Germany . . . will be ready Tuesday, Wednesday and Thursday will be fine." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that Fanchini's Ex Wife 1 was telling NIKOLAI DOZORTSEV that the money transfer cannot be done in Germany and that a criminal associate, possibly Victor, would be ready for Thursday. Later during the same call, Fanchini's Ex Wife 1 told NIKOLAI DOZORTSEV "here is one guy, asking everything, he saying, they are satisfied with everything, asking how, when." Investigating agents believe

27

Fanchini's Ex Wife 1 was informing NIKOLAI DOZORTSEV that a drug customer is asking for more narcotics and that the customer liked the quality of the narcotics sample. Later during the same call, NIKOLAI DOZORTSEV asked Fanchini's Ex Wife 1 "can you tell me about assortment? ...Things for sale, what kind of assortment." Fanchini's Ex Wife 1 replied "I have in the written order, I can make a copy for myself and I can send it to you." Fanchini's Ex Wife 1 further stated that she would send the list by "fax or SMS [text message]." NIKOLAI DOZORTSEV instructed Fanchini's Ex Wife 1 to send the list by fax and stated that he would provide Fanchini's Ex Wife 1 with the fax number by text message: "I will write to you fax number by SMS." Fanchini's Ex Wife 1 replied "yes, send it to me by SMS." NIKOLAI DOZORTSEV further stated "good, I will send you SMS. Keep your cell on." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that NIKOLAI DOZORTSEV was asking Fanchini's Ex Wife 1 what assortment of drugs were available for future shipments and that Fanchini's Ex Wife 1 agreed to send NIKOLAI DOZORTSEV a list of the available "assortment" by fax or text message. Agents further believe that NIKOLAI DOZORTSEV agreed to send Fanchini's Ex Wife 1 a text message containing the fax number she should use to send NIKOLAI DOZORTSEV the list of available narcotics.

       49.    At approximately 12:41 on the same day, NIKOLAI DOZORTSEV called NAYFELD in Moscow. During this call NIKOLAI DOZORTSEV and NAYFELD continued to discuss the pending narcotics transaction with Fanchini's Ex Wife 1. Specifically, NIKOLAI DOZORTSEV relayed information to NAYFELD about where the money pickup would take place and when NAYFELD would have to travel. NIKOLAI DOZORTSEV stated "...long story short is Tuesday where we use to live, or Thursday over there." NAYFELD then told NIKOLAI

DOZORTSEV that ". . . for me much better is Thursday . . . be over there . . . you cannot go and be in the Germany or . . ." NAYFELD further stated ". . . when will be better? From Kiev to Warsaw from Warsaw to Odessa." Based on their training and experience and the investigation that has been conducted thus far, including analysis of all intercepted calls regarding this narcotics transaction, investigating agents believe that "where we use to live" refers to Brussels, Belgium and "over there" is referring to Warsaw, Poland or Odessa, Ukraine. Agents further believe that NAYFELD and NIKOLAI DOZORTSEV agreed that NAYFELD would travel to Warsaw and Odessa so that he can be present to pick up the proceeds from a narcotics transaction on Thursday ("Wednesday or Thursday you need be over there, but it will be on Thursday"). Shortly after the call with NAYFELD, NIKOLAI DOZORTSEV called an unidentified female at a Ukrainian telephone number. During the call, NIKOLAI DOZORTSEV told the female that ". . . Thursday or Friday my friend [NAYFELD] will come over to give you all the papers [money] . . . I will know Thursday or Friday he [NAYFELD] will be in town." Investigating agents believed that NAYFELD will be traveling to the Ukraine to give the narcotics proceeds he collected to one of Fanchini Associate #1's associates. NIKOLAI DOZORTSEV further told the unidentified female: "feel sorry for one week of lost time . . . we could do next . . ." and the unidentified female responds "what you can do, all life is lost." Based on previously intercepted calls, agents believe that NIKOLAI DOZORTSEV is referring to the delay in the transaction that occurred because one of NIKOLAI DOZORTSEV 's drug associates, Kozlowski ("Arthurillo") was arrested.[6]

---

[6]     As previously discussed, NIKOLAI DOZORTSEV was intercepted discussing the arrest of "Arthurillo" with NAYFELD and other drug associates, and explaining that the arrest was causing delays in pending narcotics transactions.

50.     On June 17, 2007, NIKOLAI DOZORTSEV spoke with an unidentified male at a telephone number in Moldova. During this conversation, NIKOLAI DOZORTSEV stated "the same place where Boris [NAYFELD] picked it up last time. Boris will be there and he'll take it and bring it to my sister in the city." Agents believe that NIKOLAI DOZORTSEV was informing another criminal associate that NAYFELD was going to be picking up drug proceeds at the same place where NAYFELD had previously made a money pickup.

51.     Subsequently on June 17, 2007, NIKOLAI DOZORTSEV received a call from Fanchini's Ex Wife 1. During the call, Fanchini's Ex Wife 1 asked NIKOLAI DOZORTSEV "could you tell me when . . . they're all going crazy around here." NIKOLAI DOZORTSEV responded that he received the fax and that he would tell Fanchini's Ex Wife 1 "what we have and what we don't have from it, and the assortments that I'll be making." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that Fanchini's Ex Wife 1 was questioning NIKOLAI DOZORTSEV about the quantity and type of drugs (i.e., heroin or cocaine) that NIKOLAI DOZORTSEV would be supplying and NIKOLAI DOZORTSEV responded that he would let Fanchini's Ex Wife 1 know what he had and didn't have. Later during the call, NIKOLAI DOZORTSEV stated "I'll give you everything. Give me the fax number . . . . I'll write to you how much of 'yours' will remain with you, and how much he needs to give away and then I'll explain everything to you. But we shouldn't talk about this on the phone." Agents believe that NIKOLAI DOZORTSEV is utilizing fax transmissions to instruct Fanchini's Ex Wife 1 about the amount of money Fanchini's Ex Wife 1 would keep as a "broker" fee ("how much of yours will remain with you") and how much money she would pass on to NIKOLAI

DOZORTSEV 's associate ("how much he needs to give away") and that NIKOLAI DOZORTSEV did not want to speak about the specifics over the telephone.

52.     On June 19, 2007, NIKOLAI DOZORTSEV received a call from Fanchini's Ex Wife 1 regarding the same transaction. During this call, NIKOLAI DOZORTSEV explained to Fanchini's Ex Wife 1 "this is what I talked to your ex [Fanchini] about." Fanchini's Ex Wife 1 stated that a "client" was "waiting to pick up the papers [cash] and deliver it" but "he doesn't know how much." NIKOLAI DOZORTSEV replied "I had sent you SMS, you didn't get it?" Fanchini's Ex Wife 1 stated "yes, for this one, no I did not read anything." NIKOLAI DOZORTSEV then asked Fanchini's Ex Wife 1 "do you have my paper with all the details?" Fanchini's Ex Wife 1 stated "I threw it out. I don't keep things like that. You said we need to order merchandise [narcotics]?" NIKOLAI DOZORTSEV told Fanchini's Ex Wife 1 to "get pen and paper" and "write it down," but Fanchini's Ex Wife 1 stated that she could not talk at the moment. Fanchini's Ex Wife 1 told NIKOLAI DOZORTSEV to call "Bartek" [a criminal associate of Kozlowski and Fanchini's Ex Wife 1] in "B" [Brussels] and explain everything. Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that NIKOLAI DOZORTSEV and Fanchini's Ex Wife 1 were conversing by text messages regarding the purchase of additional narcotics ("we need to order merchandise") and that NIKOLAI DOZORTSEV was sending text messages to Fanchini's Ex Wife 1 regarding the amount and drop location for a delivery of money that was the proceeds of a completed narcotics transaction ("The client is waiting to pick up the papers [cash] and deliver it. He doesn't know how much.").

53.     Subsequent intercepts confirmed that NAYFELD picked up the drug proceeds and delivered them to Fanchini Associate #1 in Odessa, Ukraine. For example, on June 21, 2007

NIKOLAI DOZORTSEV made two calls to NAYFELD. During the first call, NAYFELD and NIKOLAI DOZORTSEV discussed that the money was provided to NAYFELD in the wrong currency and that NAYFELD would have trouble converting such a large amount of cash:

| | |
|---|---|
| NAYFELD: | They gave it to me [cursing] not change . . . By 50 [cursing] it's 10 boxes! |
| DOZORTSEV: | [cursing] |
| NAYFELD: | What I need to do now? |
| N. DOZORTSEV: | Think! How to separate it . . . maybe you can change it tomorrow morning with them . . . |
| NAYFELD: | He left, he is gone . . . where can I change it? Where? [Cursing] |
| N. DOZORTSEV: | Oh, it's not okay, I will tell them . . . Think, How can you do it. Think! |
| NAYFELD: | Maybe I will take a train? |
| N. DOZORTSEV: | A train is not good. When you will be over there by train? |
| NAYFELD: | I could go to Kiev, and tomorrow fly . . . or ask somebody to drive a car, give some . . . [cursing] |
| N. DOZORTSEV: | If Kiev, are you understand, it's a lot with you, understand? |
| NAYFELD: | A lot, yes. |
| N. DOZORTSEV: | Think. Plane is better. Think. What do you think what will be better? |
| NAYFELD: | I cannot . . . |
| N. DOZORTSEV: | Can you separate it on you? |
| NAYFELD: | I will see . . . one moment |
| N. DOZORTSEV: | Did you buy a ticket . . . plane ticket? |
| NAYFELD: | Yes, I need to give it back, I will lost money |
| N. DOZORTSEV: | Why, fly . . . |
| NAYFELD: | Stop, are you out of your mind? [Cursing] |
| N. DOZORTSEV: | You need to be tomorrow in [Fanchini Associate #1']'s city [Odessa] |
| NAYFELD: | Yes, I know. Maybe [Fanchini Associate #1] will send a car to me? |
| N. DOZORTSEV: | [Fanchini Associate #1] has to meet you and he is going . . . He knows you going to arrived and he knows your Polish phone |

Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that NIKOLAI DOZORTSEV and NAYFELD were angry that the money they were paid for the narcotics shipment was not in the right currency and that NAYFELD was given bulk cash that would be difficult to transport and convert. Agents further believe that NAYFELD and NIKOLAI DOZORTSEV were discussing the best method of smuggling the cash to the Ukraine (train or plane) and that NAYFELD could not exchange such a large amount of bulk

currency ("where can I change it? Where? [Cursing]"). Agents further believe that NIKOLAI DOZORTSEV and NAYFELD were discussing ways in which NAYFELD could hide the cash during transit ("Can you separate it on you?").

54.     Later the same day, NIKOLAI DOZORTSEV made another call on the NIKOLAI DOZORTSEV 2000 TELEPHONE to NAYFELD. During this call, NAYFELD explained that he was "going by train" to "the capital" [Kiev] and then taking a car to "Odessa," and that he would be in Odessa "in the afternoon." NIKOLAI DOZORTSEV told NAYFELD to "call me from the capital [Kiev]." NAYFELD then cursed NIKOLAI DOZORTSEV for all of the problems involved in the transaction ("I will tear your [cursing]!" and NIKOLAI DOZORTSEV responded "It's not my fault . . ."

55.     On June 22, 2007, a Fanchini associate called NIKOLAI DOZORTSEV and asked NIKOLAI DOZORTSEV to call NAYFELD in room 209. Agents believe that the associate was providing NIKOLAI DOZORTSEV with NAYFELD's room number at the hotel in Odessa, Ukraine, where NAYFELD was dropping off the drug proceeds to Fanchini Associate #1.

56.     On June 26, 2007, NIKOLAI DOZORTSEV called an individual, believed to be Fanchini Associate #1. During the conversation, Fanchini Associate #1 stated "I have sent you everything." NIKOLAI DOZORTSEV responded "That's good Banker, what do you think you get paid for, nothing?" Fanchini Associate #1 stated "you should receive your $9,950..." As the conversation continues, NIKOLAI DOZORTSEV and Fanchini Associate #1 discuss the distribution of NIKOLAI DOZORTSEV 's $52,600 of drug proceeds. NIKOLAI DOZORTSEV stated "I need it here because I have to pay for the tickets, $5,500, to Odessa..." Based on their training and experience and the investigation that has been conducted thus far, investigating agents believe that

in this call, NIKOLAI DOZORTSEV was discussing the disposition of the drug proceeds that NAYFELD had just dropped off to Fanchini Associate #1 to be laundered.

57.    Later the same day, NIKOLAI DOZORTSEV received another call from Fanchini Associate #1. During the conversation, NIKOLAI DOZORTSEV stated "Listen, they are so urgently needed here, maybe better you transfer it to me now, tomorrow, and I will have it on this week." NIKOLAI DOZORTSEV then stated "Yes, part I need to return for the tickets and part is for Arthur [DOZORTSEV]." During this same time period, several calls were intercepted between ARTHUR DOZORTSEV and NIKOLAI DOZORTSEV during which NIKOLAI discusses paying $5,600 to ARTHUR. Based on their training and experience, and the investigation that has been conducted thus far, investigating agents believe that the money NIKOLAI received from Fanchini Associate #1 and the cut NIKOLAI paid to ARTHUR DOZORTSEV were all the proceeds from the narcotics transaction organized by NIKOLAI DOZORTSEV and NAYFELD.

58.    On June 29, 2007, NIKOLAI DOZORTSEV placed a call to an individual at DOZORTSEV and SONS. The individual is an accountant for the business. During the conversation, the associate informed NIKOLAI DOZORTSEV of recent deposits into his checking account which included $9,950. This deposit corresponds to the exact amount of money NIKOLAI DOZORTSEV was to receive from Fanchini Associate #1, the Fanchini Organization's money launderer, and reflects NIKOLAI DOZORTSEV 's portion of the proceeds from a narcotics transaction NIKOLAI DOZORTSEV coordinated for the Fanchini Organization.

**Additional Calls Regarding the Defendants' Money Laundering and Smuggling Activities**

59.    On our about September 2, 2007, agents intercepted a call pursuant to a court authorized wiretap over the telephone of NIKOLAI DOZORTSEV, between NIKOLAI

DOZORTSEV and a criminal associate known as "Skinny," who, the investigation has shown, assists NIKOLAI DOZORTSEV in smuggling illegal products including narcotics and cigarettes for the Fanchini Organization. During this call, NIKOLAI DOZORTSEV and his criminal associate discussed the financial aspects of their smuggling operation. NIKOLAI DOZORTSEV stated, "We have already three hundred and forty three (343) of new goods." SKINNY replied, "Uh . . . but the . . . the official goods she received or no?" NIKOLAI DOZORTSEV answered, "No she didn't receive there was no car available. Their only gonna receive it either Monday night or Tuesday. Their gonna receive the official goods, but the uh..our goods she already has." NIKOLAI DOZORTSEV added, "because I borrowed eighty five thousand (85,000) Boris (NAYFELD) borrowed. . . we borrowed in Moscow so we paid my friend because I don't want him to stand that's why I'm pushing you to do everything quick and now we can do boom, boom, boom. Second trip. Well the first let's hope everything okay and the second one right away. And then maybe even a third one still in September. And then we go already to the new business." It is my opinion, based on my training, experience and knowledge of the investigation to date that this call related to the cost and expenses related to narcotics/cigarettes/and other counterfeit products being smuggled by the Fanchini organization throughout Europe.

60.    On or about September 6, 2007, NIKOLAI DOZORTSEV and SKINNY had another intercepted conversation about the expenses and costs of operating their illegal smuggling business. During the call, Skinny asked NIKOLAI DOZORTSEV what the profit was and if NIKOLAI DOZORTSEV counted the profit. NIKOLAI DOZORTSEV replied, "No I have to sit down and count but I counted. What why you always thinking about profit? Why you don't put money to buy the 3rd *girl*. Buy another load of *fresh goods* and take money for expenses."

35

NIKOLAI DOZORTSEV added, "the client prepaid us extra when he (NAYFELD) gave for his share for the two new *girls* (drugs) for the two *loads of fresh goods*." It is my opinion, based on my training, experience and knowledge of the investigation to date, that "girls" was a coded reference to drugs, and "fresh goods" referred to cover loads and cigarettes.

    61.  On our about September 10, 2007, agents intercepted a call pursuant to a court authorized wiretap over the telephone of NIKOLAI DOZORTSEV. During the call, NIKOLAI and a criminal associate discussed expenses and monies they have from there illegal smuggling of narcotics/cigarettes/counterfeit products. The criminal associate ("CA1") stated, "I have here this 28,538". CA1 asked NIKOLAI DOZORTSEV, "Do you have the fax?" NIKOLAI answered, "I don't have it in front of me in the car. But I remember." CA1 replied, "But what is this money?" NIKOLAI answered, "This money he's going to either give me in the 'B' (Belgium) when we come. If you want to come there or he can send it or he can bring it to Ukraine. But the best thing is he want to give it to us in 'B.'" CA1 responded, "He must pay this extra . . . . But listen, you jotted down here 33 each, yeah? Correct? 33 Euros, one for. . . for the investment, correct? I understand its two (2) girls?" NIKOLAI DOZORTSEV answered, "All the investment now. The two girls plus the *second shot* which we're going to buy of fresh goods. Everything that's already. Not me laying out the money. It's me giving one third and you giving one third because he (NAYFELD) already gave his one third." It is my opinion, based on my training, experience and knowledge of the investigation to date this call related to the cost and expenses related to narcotics/cigarettes/and other counterfeit products being smuggled throughout Europe. It also is my opinion and experience that the "second shot" is a recognized term by Russian Organized Crime (ROC) to signify drug shipments.

62.     In September 2007, Romanian authorities seized a tractor trailer load of illegal cigarettes concealed inside crates. Based on our investigation Agents believe this seizure is directly tied to DOZORTSEV, CA1 and the Fanchini Organization.

### Calls Regarding Fanchini's Arrest

63.     On September 28, 2007, a grand jury in the Eastern District of New York returned a three-count indictment against Ricardo Fanchini, charging him with conspiring to import cocaine, heroin and MDMA into the United States, conspiring to distribute cocaine, heroin and MDMA knowing that such controlled substances would be imported into the United States, and money laundering. On October 3, 2007, Fanchini was arrested in the United Kingdom on a provisional arrest warrant. Since Fanchini's arrest, NIKOLAI DOZORTSEV, NAYFELD and other members of the Fanchini Organization have been intercepted discussing Fanchini's arrest and their own exposure. For example, the same day that Fanchini was arrested, NIKOLAI DOZORTSEV was intercepted on numerous calls informing other members of the organization that "the boss" was arrested. In other calls NIKOLAI DOZORTSEV and NAYFELD expressed their concern that Fanchini's arrest was tied to a larger investigation and that they themselves should be worried about being arrested. NIKOLAI DOZORTSEV also explained that he had taken "everything" out of his house in anticipation of an arrest being made. NIKOLAI DOZORTSEV and NAYFELD were also intercepted talking about hiring lawyers and other agents to find out exactly what the charges were against Fanchini (and whether they were subjects of the investigation).

64.     On October 3, 2007, agents intercepted an incoming call that NIKOLAI DOZORTSEV received from telephone number 44-7816090909. During this conversation, NIKOLAI DOZORTSEV and another money laundering co-conspirator discussed the arrest of

FANCHINI when NIKOLAI DOZORTSEV stated "Boss has got a problem...he just got picked up." NIKOLAI DOZORTSEV then discussed traveling to Europe to "pick up" and that he (NIKOLAI DOZORTSEV) would distribute proceeds to the co-conspirator when he stated "because I was supposed to bring something to you also."

65.    In another conversation that agents intercepted on October 3, 2007, NIKOLAI DOZORTSEV received an incoming call where the digits did not register on the wiretap. During this call, NIKOLAI DOZORTSEV and a co-conspirator discussed the arrest of FANCHINI and discussed that NIKOLAI DOZORTSEV would travel to Europe to pick up $300,000 in proceeds. They discussed that $100,000 would be given to the co-conspirator from the previous call and that $200,000 was for NIKOLAI DOZORTSEV. During the call, the co-conspirator stated "200 is your's, right? Right? Where to send the 200?" Agents believe that NIKOLAI DOZORTSEV traveled to Europe to collect proceeds that would be used as the down payment for the cocaine deal discussed above.

## REQUESTS FOR SEARCH WARRANTS

### The Staten Island Premises of the Defendant NAYFELD

66.    On information and belief, there is probable cause to believe that there will be located in THE PREMISES KNOWN AND DESCRIBED AS 161 NEVADA AVENUE, STATEN ISLAND, NEW YORK (the "STATEN ISLAND PREMISES"), within the Eastern District of New York, certain property, namely: cellular telephones and telephone bills, all of which constitutes evidence of narcotics trafficking and conspiracy to do the same in violation of Title 21, United States Code, Sections 841, 843, 846, 952(a), 959(a) and 963, money laundering and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956.

67.     Based on my training and experience in general and in this case in particular,, I know that persons engaged in money laundering and narcotics business often communicate by telephone and other means to facilitate their illegal activities business, and maintain such telephones and their telephone bills where they have ready access to them, frequently in their residences.

68.     In a substantial number of residential searches executed in connection with the narcotics trafficking and money laundering investigations in which I have been involved, and in such searches conducted by other experienced law enforcement officers who have conveyed their experiences to me, telephones and phone bills are often recovered.

69.     As detailed above, the defendant BORIS NAYFELD is a high-ranking member of Russian Organized Crime who is a member of the Fanchini Organization engaged in large-scale narcotics trafficking and money laundering for that organization.

70.     The STATEN ISLAND PREMISES is a tan colored, detached, single-family, two-story residence, currently under construction, with scaffolding erected in front of the house, and a driveway leading from two stone pillars on the street to the house, located at 161 Nevada Avenue, Staten Island, New York.

71.     The STATEN ISLAND PREMISES is the residence of BORIS NAYFELD. I base my belief on the following facts. First, the landline telephone used by NAYFELD which agents are currently intercepting pursuant to a court-authorized Title III wiretap is registered to NAYFELD's wife, Angela Kiperman, at 161 Nevada Avenue, Staten Island, New York. In addition, NAYFELD's New York State Driver's license lists his home address as 161 Nevada Avenue, Staten Island, New York, as does his passport. Finally, agents conducting surveillance have observed NAYFELD entering the residence.

*Based on the investigation that has been conducted thus far, agents have determined that NAYFELD does not have any other location or place of business which he regularly uses. Therefore, I believe*

72.    As part of its investigation into the Fanchini Organization, beginning in *Evidence of his criminal activities will be located in the STATEN ISLAND PREMISES* September 2007, the government was granted authorization from the United States District Court for the Eastern District of New York to intercept the wire communications on telephones used by the defendant BORIS NAYFELD.

73.    The interceptions over this telephone and other telephones used by Fanchini Organization members, provided crucial evidence of the defendant's criminal activities, in his own words and often contemporaneous thereto. These conversations established that the defendants used telephones, including their cellular telephones, in furtherance of his criminal activities.

74.    Based upon the foregoing, I believe that cellphones and cellphone bills used in furtherance of criminal activity will be recovered from the STATEN ISLAND PREMISES, and that there is probable cause to search the STATEN ISLAND PREMISES.

## The Brooklyn Premises of NIKOLAI DOZORTSEV

75.    On information and belief, there is probable cause to believe that there will be located in THE PREMISES KNOWN AND DESCRIBED AS 2805 OCEAN PARKWAY, APARTMENT 10B, BROOKLYN, NEW YORK (the "BROOKLYN PREMISES"), within the Eastern District of New York, certain property, namely: any and all monies, financial records, bank records, business records, investment records, work papers, correspondence, facsimiles, memoranda, canceled checks, drafts, safes, ledgers, wire transfer receipts, money orders, cellular telephones, pagers, fax machines, notes, notebooks, telephone and address records, computer hardware, including computers, central processing units, external and internal drives and external and internal storage equipment or media, monitors, terminals or video display units, together with peripheral equipment such as keyboards and modems, computer or data processing software, or data including,

40

but not limited to, hard disks, floppy disks, magnetic tapes, integral RAM or ROM units, and any other permanent or transient storage device(s), stored electronic mail whether contained on magnetic tape, diskettes, photo-optical devices, or any other medium;

all of which constitutes evidence of narcotics trafficking and conspiracy to do the same in violation of Title 21, United States Code, Sections 841, 843, 846, 952(a), 959(a) and 963, money laundering and conspiracy to do the same, in violation of Title 18, United States Code, Section 1956.

76.     As detailed above, the defendant NIKOLAI DOZORTSEV is a high-ranking member of Russian Organized Crime who serves as a leading member of the Fanchini Organization, and is engaged in large-scale narcotics trafficking and money laundering for that organization.

77.     As part of its investigation into the Fanchini Organization, beginning in June 2007, the government was granted authorization from the United States District Court for the Eastern District of New York to intercept the wire communications on telephones used by the defendant NIKOLAI DOZORTSEV.

78.     The ensuing interceptions over these telephones, including interceptions concerning illegal Fanchini Organization business with Ricardo Fanchini and other Fanchini Organization members, which are detailed more fully above, provided crucial evidence of the defendants' criminal activities, in his own words and often contemporaneous thereto. These conversations established that the defendant used telephones, including their cellular telephones, faxes, emails, computers and various business documents and instruments in furtherance of his criminal activities.

79.     The BROOKLYN PREMISES is a single-family apartment in a multi-story red brick apartment building with a tan cement wall in front of the building, located at 2805 Ocean Parkway, Brooklyn, New York. The number "2805" is displayed on the front of the building, and the BROOKLYN PREMISES are located on the 10th Floor of the building.

80.     The BROOKLYN PREMISES is the residence of NIKOLAI DOZORTSEV. I base my belief on the following facts. During numerous conversations intercepted over DOZORTSEV's telephones pursuant to court authorized Title III wiretaps, DOZORTSEV stated that the BROOKLYN PREMISES was his home address. Further, the telephone number 718-938-2000, a cellular telephone used by NIKOLAI DOZORTSEV, is subscribed to by a NIKOLAI DOZORTSEV, 2805 Ocean Parkway, Brooklyn, New York. In intercepted telephone conversations, NIKOLAI DOZORTSEV has also stated that he can be sent faxes at the telephone number 718-333-1005, which is a landline subscribed to Irene Dozortsev (DOZORTSEV's wife), 2805 Ocean Parkway, Brooklyn, New York. Finally, agents have conducted surveillance of NIKOLAI DOZORTSEV and have observed him exiting the rear of the building in his vehicle.

81.     Based upon the foregoing, I believe that the telephones the defendant NIKOLAI DOZORTSEV used to speak to Ricardo Fanchini and other Fanchini Organization members in the above-mentioned intercepted communications will be recovered from the BROOKLYN PREMISES. Further, wire intercepts of NIKOLAI DOZORTSEV's telephone conversations reveal that he also sends, receives and maintains documents concerning the Fanchini Organization's illegal businesses, and uses computers and fax machines in furtherance of illegal Fanchini Organization business at the BROOKLYN PREMISES, which adds to my belief that such items will also be recovered from the BROOKLYN PREMISES. These intercepts include:

(a)     A June 16, 2007 coded conversation between NIKOLAI DOZORTSEV and Ricardo Fanchini, in which Fanchini and NIKOLAI DOZORTSEV discussed NIKOLAI DOZORTSEV's coordination of the purchase of a yacht for Fanchini, which I believe will not only be purchased with narcotics proceeds, but which the Fanchini organization will use in connection with narcotics trafficking, consistent with the organization's historical use of yachts detailed above.  During the conversation, Fanchini said that he would like to read documents concerning the purchase of the yacht ("I'll take a paper and we can go through.  Maybe I will open that 'bimmer' and read about all these sips. Did you send it to me?"), and NIKOLAI DOZORTSEV stated that he was leaving his house at that time and instructed him to read and print the email NIKOLAI DOZORTSEV had sent him ("Yes.  I did send you everything. . . .  Read my email. . . .  Ok.  Take it, read it, print it.  Call me on my cell if something.").  Agents believe this intercepted conversation shows that NIKOLAI DOZORTSEV sends Fanchini email from a computer located within the BROOKLYN PREMISES.

(b)     A June 28, 2007 conversation between NIKOLAI DOZORTSEV and Fanchini's Wife who, as detailed above, engages in Fanchini organization illegal business.  Based on prior intercepts, agents believe Fanchini's Wife was serving as the buyer of a gas station in New Jersey that NIKOLAI DOZORTSEV was coordinating for Fanchini.  During the call, Fanchini's Wife and NIKOLAI DOZORTSEV discussed the steps she needed to take to complete the purchase (e.g., "I have a question about the email about the personal financial statements. . . . They're asking for 'applicant name' and then 'employer.'  What should I say for employer?").  During this conversation, NIKOLAI DOZORTSEV asked Fanchini's Wife if she received the email concerning where she send the information concerning the transaction ("Tell me.  You got the email for where

43

to send this stuff?"). When Fanchini's Wife stated that she had, NIKOLAI DOZORTSEV instructed her that she needed to respond to the bank, not to him ("Not to me. jerald.newman@stanleycapital.com."). Agents believe this emails again shows NIKOLAI DOZORTSEV's use of email in communicating with Fanchini Organization associates concerning Fanchini Organization business.

(c)     A September 10, 2007 conversation between NIKOLAI DOZORTSEV and an individual who prior intercepts revealed coordinates the transportation of illegal shipments in Europe for the Fanchini Organization. During the conversation that ensued, the two men discussed how to split the proceeds of a current transaction. The individual asked NIKOLAI DOZORTSEV if he had received the fax the individual sent to NIKOLAI DOZORTSEV, when NIKOLAI DOZORTSEV replied that he had received it, the individual told him to read it. NIKOLAI DOZORTSEV responded, "I can't because I'm in the car. The fax is in my house." I believe this call shows that NIKOLAI DOZORTSEV receives faxes concerning Fanchini Organization business at the BROOKLYN PREMISES, and retains records pertaining to Fanchini Organization business at the BROOKLYN PREMISES.

(d)     A September 21, 2007 call between NIKOLAI DOZORTSEV and another Fanchini Organization associate, in which NIKOLAI DOZORTSEV told the associate that he would wire him money (NIKOLAI DOZORTSEV: "Give me your corporate account requisites." the associate: "OK. How much are you going to wire?" NIKOLAI DOZORTSEV: "I'll tell you by Sunday or Monday.") and asked the amount he owed ("By the way, what is the balance."). When the associate provided a figure ("21"), NIKOLAI DOZORTSEV instructed him not to tell him the amount but send fax him documents detailing the debt ("Don't dictate it to me. I don't need that.

If you want, fax it to me or email it to me.") Then, prior to a discussion about how NIKOLAI DOZORTSEV would provide the money to the associate because the associate stated he could not handle large amounts of cash, NIKOLAI DOZORTSEV provided him with the fax number 718-333-1005, which is a landline subscribed to by NIKOLAI DOZORTSEV's wife at the BROOKLYN PREMISES. Agents believe this call again shows that NIKOLAI DOZORTSEV uses the BROOKLYN PREMISES to conduct Fanchini Organization business, including record keeping, and that instrumentalities and evidence of that business will be found at the BROOKLYN PREMISES.

82. Based upon the foregoing, I believe that there is probable cause to search the BROOKLYN PREMISES.

### CONCLUSION

WHEREFORE, your deponent respectfully requests that the defendants NIKOLAI DOZORTSEV, ARTHUR DOZORTSEV, BORIS NAYFELD and ROBERTO ALCAINO be dealt with according to law, and that warrants to search the BROOKLYN and STATEN ISLAND premises be issued.

Because of the nature and contents of this application, I respectfully request that this Affidavit and the search and arrest warrants be filed under seal.

Ryan McHugh
Special Agent
Drug Enforcement Administration

Sworn to before me this
12th day of October, 2007

Hon Roanne Mann
United States Magistrate Judge
Eastern District of New York

45